AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

JUN 20 2016

| UNITED STATES OF AMERICA<br>v.<br>ROBERT PADUANO | DOCKET NO.<br>CENTRAL DISTRICT OF CALIFORNIA<br>DEPUTY |
|---|---|

MAGISTRATE'S CASE NO.

## SA16-323M

Complaint for violation of Title 18, United States Code, Section 1347: Health Care Fraud

| NAME OF MAGISTRATE JUDGE<br>HONORABLE KAREN E. SCOTT | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Santa Ana, California |
|---|---|---|

| DATE OF OFFENSE<br>Date unknown to in or about June 2015 | PLACE OF OFFENSE<br>Orange County, and Elsewhere within the CDCA | ADDRESS OF ACCUSED (IF KNOWN)<br>St. Augustine, FL |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

**SEE ATTACHMENT "A" WHICH IS INCORPORATED HEREIN BY THIS REFERENCE**

LODGED

2016 JUN 17 PM 1:15
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
BY

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

   (See attached Affidavit which is incorporated herein by this reference as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**MONICA PANDIS**  /s/ |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – Federal Bureau of Investigation |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE[1]  /s/   KAREN E. SCOTT | DATE<br>June 20, 2016 |
|---|---|

[1] See Federal Rules of Criminal Procedure 3 and 54

AUSA: Mark Aveis, USAO CDCA, Major Frauds Section, (213) 894-4477                REC: Bond

ATTACHMENT "A" TO COMPLAINT (PADUANO)

[18 U.S.C. §§ 1347, 2(a),(b)]

I.    GENERAL ALLEGATIONS
      A.    Defendant and Related Entities
      At all relevant times,
            1.    Defendant ROBERT PADUANO ("defendant PADUANO") owned and
operated a business entity called Global Marketing Strategies LLC ("GMS"), in or about St.
Augustine, Florida, through which defendant PADUANO operated an Internet-based
telemedicine site.
            2.    TC Medical Pharmacy ("TCMP") was a pharmacy located at 760
Washburn Ave., Suite 1, Corona, California 92882, within the Central District of California.
T.L. was TCMP's pharmacist-in-charge.
            3.    Trestles RX LLC and Trestles Pain Management Specialists LLC
(collectively "Trestles") were located at 25971 Pala, Suite 120, Mission Viejo, California.
            4.    L.M. was a "distributor" at Trestles and, in the Trestles hierarchy, was
over defendant PADUANO who was L.M.'s "sub-distributor."
      B.    TRICARE
            3.    TRICARE was a federal health benefit program, as defined by 18 U.S.C.
§ 24(b),  that provided coverage for Department of Defense beneficiaries world-wide, including
active duty service members, National Guard and Reserve members, retirees, their families, and
survivors.
            4.    For the calendar years 2013-2015, inclusive, TCMP submitted
approximately 329 claims for TRICARE reimbursement for filling compounded medication
prescriptions for a total claimed amount of approximately $11,013,150.
      D.    Compounded Medications
            5.    In general, "compounding" is a practice in which a licensed pharmacist, a
licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a
licensed pharmacist, combines, mixes, or alters ingredients of a drug or multiple drugs to create a
drug tailored to the needs of an individual patient. Compounded drugs are not FDA-approved,
that is, the FDA does not verify the safety, potency, effectiveness, or manufacturing quality of
compounded drugs. The California State Board of Pharmacy regulates the practice of
compounding in the State of California.
            6.    Compounded drugs may be prescribed by a physician when an FDA-
approved drug does not meet the health needs of a particular patient. For example, if a patient is
allergic to a specific ingredient in an FDA-approved medication, such as a dye or a preservative,
a compounded drug can be prepared excluding the substance that triggers the allergic reaction.
Compounded drugs may also be prescribed when a patient cannot consume a medication by

traditional means, such as an elderly patient or a child who cannot swallow an FDA-approved pill and needs the drug in a liquid form that is not otherwise available.

II.     THE FRAUDULENT SCHEME

7.      Beginning on or about a date unknown, and continuing to in or about June 2015, in Orange, Riverside, and Los Angeles Counties, within the Central District of California, and elsewhere, defendant PADUANO, together with others known and unknown, knowingly, willfully, and with the intent to defraud, executed and attempted to execute a scheme and artifice: (1) to defraud a federal health care benefit program, namely, Tricare, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain money from Tricare by means of material false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

8.      The fraudulent scheme operated, in substance, in the following manner:

a.      Defendant PADUANO, and others known and unknown, would operate an online telemedicine site through which defendant PADUANO, and others known and unknown, would promote compounded medication prescriptions for L.M., and others at Trestles, and others known and unknown, the cost for fulfillment of which would be reimbursed by Tricare.

b.      Defendant PADUANO, and others known and unknown, would retain physicians, including N.C., to review patient files created in connection with the operation of defendant PADUANO's telemedicine site. Defendant PADUANO would represent to such physicians that the files had been prepared by nurse practitioners or other qualified health care providers when, as defendant PADUANO well knew, nurse practitioners or other qualified health care providers had not prepared such files.

c.      Defendant PADUANO, and others known and unknown, without N.C.'s permission, would use N.C.'s identity and medical credentials to authorize compounded medication prescriptions.

d.      Defendant PADUANO, and others known and unknown, would cause prescriptions, both authorized by his telemedicine doctors, and not authorized, to be sent to Trestles, and others known and unknown, for routing to pharmacies of Trestles' choice, and to pharmacies of PADUANO's choice, for fulfillment and billing to, and payment from, Tricare.

e.      The pharmacies would, in turn, pay defendant PADUANO, and others known and unknown, a substantial percentage of Tricare claims adjudication payments for sending those prescriptions.

f.      Defendant would bribe and threaten N.C. from disclosing the misuse of her identity and medical credentials in order to continue and conceal the existence of the fraudulent scheme.

III.    EXECUTION OF THE FRAUDULENT SCHEME

9.      In or about April 2015, Trestles, from Mission Viejo, California, caused to be sent to Haeoyou Pharmacy, in Palmdale, California, a prescription to be filled for Tricare beneficiary F.P.

10. In or about April 2015, TCMP filled, and obtained Tricare reimbursements on claims for, prescriptions for A.B., K.R., A.N., B.M.P., and C.W.

## AFFIDAVIT

I, MONICA PANDIS, being duly sworn, declare and state as follows:

### I.    AFFIANT'S BACKGROUND

1.    I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI").  I have been so employed since approximately June 2002.  I am currently assigned to the white collar crime squad of the Orange County Resident Agency of the Los Angeles FBI Field Division, which investigates allegations of Public Corruption and Health Care Fraud.  Over that past 14 years I have been assigned to investigate Health Care Fraud.  As an FBI SA, I have investigated over 50 health care fraud and other white-collar cases including cases involving the payment of illegal kickbacks affecting federal health care programs. Before becoming an FBI SA, I was a medical social worker assigned to hospice and pediatric HIV patients.  I have a Master's Degree in Social Work, a Bachelor's Degree in Behavioral Science and a Minor in Criminal Justice and Corrections.

### II.    PURPOSE OF AFFIDAVIT

2.    This affidavit is made in support of a complaint and request for the issuance of an arrest warrant charging ROBERT PADUANO with health care fraud, in violation of 18 U.S.C. § 1347.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, documents obtained from various sources including financial institutions,

information obtained from various law enforcement personnel, and from witnesses.  This affidavit is intended to show only that there is probable cause to support the referenced complaint and request for issuance of an arrest warrant for PADUANO.  It does not purport to set forth all of my knowledge of or investigation into this matter, nor is it intended to provide all of the information obtained in connection with the investigation.  Also, unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and are not *verbatim*.

**III. SUMMARY OF PROBABLE CAUSE**

4.   Based upon the evidence and information stated herein, I have probable cause to believe that PADUANO schemed to obtain unauthorized prescriptions for medication so that those prescriptions would be filled and their cost reimbursed by a federal health care program.

**IV.   STATEMENT OF PROBABLE CAUSE**

A.   BACKGROUND

TRICARE[1]

5.   "In 1994, Tricare replaced CHAMPUS as the health care program for active-duty military personnel, retirees, and their families.  See http:// www.Tricare.mil/faqs/question . . . ," U.S. ex rel. Nowak v. Medtronic, Inc., 806 F. Supp. 2d 310, 318,

---

[1] Statutory and case citations and legal analysis have been prepared by the Assistant U.S. Attorney with whom I am working on this investigation.  I have relied upon those citations and that analysis in support of this affidavit.

note 5 (D. Mass. 2011), as a "comprehensive managed health care program for the delivery and financing of health care services in the Military Health System," see 32 C.F.R. § 199.17(a). Tricare is applicable to all of the uniformed services.  32 C.F.R. § 199.17(a)(3).  "[A]ll CHAMPUS-eligible beneficiaries who are not Medicare eligible on the basis of age are eligible to enroll in" a Tricare program.  32 C.F.R. § 199.17(c). Tricare is a "health care benefit program" as defined by 18 U.S.C. § 24(b), that affects commerce, see Taylor v. United States, 89 F.Supp.3d 766, n. 1 (E.D.N.C. 2014), and as that term is used in 18 U.S.C. § 1347.  Tricare is administered by the Defense Health Agency ("DHA").

Compounded Medications

6.   During the course of this investigation, I have learned from reviewing documents, witness interviews, and speaking with other investigators involved in the investigation, that:

a.   In general, "compounding" is a practice in which a licensed pharmacist, a licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a licensed pharmacist, combines, mixes, or alters ingredients of a drug or multiple drugs to create a drug tailored to the needs of an individual patient.

b.   Compounded drugs are not FDA-approved, that is, the FDA does not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.  The California Board

of Pharmacy regulates the practice of compounding in the State
of California.

   c.   Compounded drugs may be prescribed when an FDA-
approved drug does not meet the health needs of a particular
patient.  For example, if a patient is allergic to a specific
ingredient in an FDA-approved medication, such as a dye or a
preservative, a compounded drug can be prepared excluding the
substance that triggers the allergic reaction.  Compounded drugs
may also be prescribed when a patient cannot consume a
medication by traditional means, such as an elderly patient or
child who cannot swallow an FDA-approved pill and needs the drug
in a liquid form that is not otherwise available.

   d.   The compounded medication prescriptions in this
case were ostensibly prescribed for the treatment of pain,
scarring, stretch marks, erectile dysfunction, or for "general
wellness."  The prescriptions were based on substantially
similar 8 1/2" x 11" forms with check-the-box sections that
described the chemical compounds for each of these conditions.
Although it may be possible, I have reviewed hundreds of these
forms, and discussed well over a thousand of these forms with
other agents involved in this and related investigations, and I
am not aware of any instances in which a prescribing physician
altered the pre-formulated prescriptions to suit the individual
needs of any patient.

   Telemedicine

   7.   During the course of this investigation, I have
learned from interviewing and reviewing reports of interviews of

4

a pharmacist, pharmacy technicians, pharmacy owners, doctors
under contract with telemedicine sites, and from discussing the
case with other investigators involved in this investigation,
that:

   a.   A prescription is typically delivered to a
pharmacy by the patient for whom the prescription is written, or
phoned-in or otherwise communicated directly by the prescribing
physician's office to the pharmacy for fulfillment.

   b.   An enormous number of compounded medications
prescriptions – in the thousands during a few-month period of
time in early to mid-2015 – were not delivered to pharmacies in
that manner.  Instead, they were generated through online
"telemedicine" sites and then e-faxed to a pharmacy for
fulfillment; the prescription was not sent to the patient who,
in turn, delivered the prescription to the pharmacy of his/her
choice for fulfillment.[2]

   c.   A telemedicine site is ostensibly designed to
assist individuals in obtaining low-cost, easy access to health
care for minor ailments.  A patient is supposed to pay a small
fee and complete an online questionnaire whereby the patient
describes his/her symptoms and provides some health history.

   d.   A doctor under contract with the telemedicine
site operator then receives and reviews the questionnaire and,
at least in theory, exercises independent judgment to determine

---

[2]   In fact, I have learned that dozens, if not hundreds, of
patients who received these prescriptions knew nothing about
them until the prescriptions showed up on their doorsteps.

a course of treatment that may, or may not, include prescription medication.

   e. Telemedicine site operators may accept payment from third parties to advertise compounded medications. More specifically, for a fee, telemedicine site operators may send to their contract doctors blank medications prescription forms, or at times, such forms with "boxes checked" for the prescription of specific compounded medications.

  <u>Health Care Fraud</u>

  8. In order to prove a defendant guilty of health care fraud based upon a scheme to defraud, pursuant to 18 U.S.C. § 1347, the government must prove each of the following elements beyond a reasonable doubt:

   (1) The defendant knowingly and willfully devised or participated in a scheme to defraud a health care benefit program;

   (2) The statements made or facts omitted as part of the scheme were material;

   (3) The defendant acted with intent to defraud; and

   (4) The scheme involved the delivery of or payment for health care benefits, items or services for a federal health care program.

<u>United States v. Awad</u>, 551 F.3d 930, 939 (9th Cir. 2009).

B.    CRIMINAL INVESTIGATION

Tricare Beneficiary Complaints

9.    Based upon my discussion with agents of the Defense
Criminal Investigation Service ("DCIS"), I learned the
following:

a.    In mid-2015, DHA made a criminal referral to the
Defense Criminal Investigative Service ("DCIS") based, in part,
on complaints that DHA had received from Tricare beneficiaries.
Among other things, beneficiaries had complained about
prescriptions for compounded medications.  For example, on or
about April 14, 2015, Tricare beneficiary M.H. complained to DHA
that M.H. had received an "Explanation of Benefits" form from
Tricare stating that M.H. received a prescription for compounded
medications for which the dispensing pharmacy had charged
Tricare $59,362.33; that the beneficiary had never received the
medication; that the beneficiary did not know the prescribing
physician; and that the beneficiary had received no phone calls
about the medication.  Tricare paid the dispensing pharmacy
$46,981.59 on that claim.[3]

b.    At least twenty such similar complaints were made
to DHA around this same period of time.

---

[3]  I reviewed Tricare claims data and noticed that it was
not uncommon for Tricare to reimburse for less than the amount
of a claim.

<u>N.C.'s Work As A Contract Doctor for PADUANO's Telemedicine</u>
<u>Site</u>

10.   Based upon my review of a report of an interview of
N.C. on April 21, 2016 by DCIS agents, my discussion with agents
who attended that interview, my review of documents that N.C.
provided in connection with that interview, and my review of
notes of a DHA auditor regarding N.C.'s statements made during
the course of an audit by DHA in August 2015, I learned the
following:

     a.   N.C. is a medical doctor.  She was a chiropractor
before she earned her medical degree from Ross University.  She
became board-certified in internal medicine in September 2011.
She maintains privileges to practice medicine at several
hospitals in the Denver area.  She is a hospitalist and runs the
intensive care unit at a hospital in Riverton, CO.

     b.   When she graduated from medical school, N.C. and
other graduates were recruited to work as telemedicine doctors.
She saw telemedicine as an opportunity to provide access to
health care for people living in rural areas challenged by bad
weather, distance to treatment, and cost.  She initially thought
that telemedicine was the wave of the future that would also
provide a great opportunity to make money on a part-time basis.

     c.   N.C. initially did telemedicine patient consults
for American Well Telemedicine ("AW").  She used AW software to
conduct video-teleconferences with AW patients.  She received a
flat salary of $125,000 per year, which was not based on the
number of patients.  AW nurses did the initial patient intake

8

based on information provided by the patients, then nurses set-up a video-teleconference between N.C. and the patient.  N.C. typically evaluated patients with minor cold symptoms, rashes, and other minor medical problems.

  d. In or about April 2015, N.C. worked as a contract doctor for another telemedicine site, operated by PADUANO called Global Marketing Strategies ("GMS").

  e. PADUANO told N.C. that GMS was licensed in all 50 states.

  f. In April 2015, PADUANO sent N.C. two large packages consisting of approximately 91 patient files for N.C. to review.  PADUANO told N.C. that he (PADUANO) was under a big time-crunch to have the files reviewed.  PADUANO instructed N.C. to review each file and then initial or sign each file.  PADUANO told N.C. that his (PADUANO's) nurse practitioners had prepared the files.

  g. N.C. reviewed the files that PADUANO had sent to her.  N.C. saw a lot of nurse practitioners' handwritten notes but noticed that other files were missing nurses' notes or that the notes were incomplete.  N.C. advised PADUANO about the missing and incomplete nurse practitioners' notes and requested additional notes, but PADUANO repeatedly rushed her by telling her that she was taking too long.  PADUANO did provide additional nurse practitioners' notes for some, but not all, of the files.

h.   N.C. did not authorize any prescription medication for any of the patients whose files PADUANO had sent to N.C. for review.

i.   N.C. was suspicious of PADUANO's claims that nurse practitioners had prepared the files or notes, and asked PADUANO for the nurse practitioners' phone numbers and license information as well as for the phone numbers that the nurse practitioners had used to talk to the patients.  PADUANO did not provide that information to N.C.  PADUANO told N.C. that all calls with patients were recorded but PADUANO did not provide the recordings.

j.   PADUANO told N.C. that Tricare was investigating doctors that had not called patients but who had nonetheless issued compounded medication prescriptions.  PADUANO told her that Tricare was examining doctors that did not have a true doctor-patient relationship.  PADUANO identified a specific telemedicine site, Complete Healthcare Concierge in Florida, which was one of the telemedicine sites whose doctors never called the patients.

k.   On June 11, 2015, N.C. told PADUANO that he was a fraud.  PADUANO asked N.C. why N.C. needed to have all of the information N.C. had sought about the nurse practitioners.  PADUANO stated that "If I had nurses working for me, why would I need you [?]"

l.   N.C. did authorize medications for some of the GMS patients referred to her by PADUANO, but not for any of the

approximately 91 patients whose files she had received from PADUANO, as detailed above.

m.   At some point after she reviewed the approximately 91 patient files provided by PADUANO, N.C. received a phone call from at least one of the patients whose file she had reviewed.  The patient told her that the patient had received compounded medication from TC Medical Pharmacy ("TCMP")[4] that had been prescribed by N.C., but the patient had not been examined by N.C., did not know N.C., and had not ordered nor known about the medication until it was delivered to the patient's home.

### N.C.'s Discussion with Tony Le, Pharmacist/Owner of TCMP, Regarding Unauthorized Prescriptions

n.   Based on at least one call that N.C. had received from a patient who claimed that N.C. had prescribed compounded medication about which the patient knew nothing, N.C. called TCMP.

o.   N.C. spoke to TCMP pharmacist Tony Le.  Le told N.C. that Le had contracts with PADUANO whereby PADUANO would provide Le with a steady stream of compounded medication prescriptions in exchange for a payment of the proceeds that Le would receive for processing those prescriptions.[5]

_____

[4]   I know from reviewing California Board of Pharmacy records that TCMP was located in Corona, California and that one of its licensed pharmacists was Tony Le.  TCMP closed in or about 2015.

[5]   I know from reviewing documents and speaking with other investigators involved in this investigation that Le was one of

p. Le told N.C. that his contract with PADUANO called for splitting the "proceeds" with PADUANO at a rate of "60/40" or "70/30."

q. Le told N.C. that Le would reverse the prescriptions that bore N.C.'s name as the prescribing physician. Le told N.C. that "this is going to cost me a lot of money." N.C. did not know whether Le actually reversed any of the prescriptions with N.C.'s name.

PADUANO's "Offer" and Threat to N.C.

r. At some point, N.C. spoke to PADUANO. PADUANO told N.C. that he would pay N.C. $200,000 to allow the prescriptions to be filled by TCMP and not question them.

s. N.C. did not accept the offer that she thought was a bribe. PADUANO then threatened N.C. by stating that he would ruin her career and her family.

11. I reviewed documents provided by N.C. Those documents included "patient info sheet[s]" that contained the following entries:

a. A patient's name, address, and Social Security number.

b. A brief (typically, two-line) description of whether the patient had "pain."

---

several pharmacists whose pharmacies had contracts with so-called "marketers" to whom they had agreed to pay a portion of the amount that the pharmacy received as reimbursement from Tricare for claims for filling compounded medication prescriptions.

12

c.     "Insurance information," with the handwritten notation "Tricare" following by the patient's Tricare member identification.

d.     Notations for "Global Marketing Strategies" and a pharmacy, typically "TC Medical Pharmacy," and what appeared to be its fax number.

Tricare Claims Analysis Regarding Prescriptions Purportedly
Authorized By N.C.

12.     I reviewed Tricare claims data sent by DHA to DCIS investigators in this case, that identified N.C. as the prescribing physician for compounded medications prescriptions filled by four pharmacies located in the Central District of California, including TCMP. During this investigation, I have learned from reviewing that data that, toward the end of 2014 and to about May 2015 when Tricare substantially terminated honoring claims for reimbursement for filling compounded medications prescriptions due to waste, fraud, and abuse, there was an enormous uptick in those prescriptions filled by dozens of pharmacies nationwide. Tricare data show that twenty such pharmacies in the Central District of California accounted for approximately $180,248,230 in billed claims for 2015 alone. The same data show the following:

a.     TCMP collected on relatively few (approximately 28) Tricare claims for reimbursement for filling compounded medication prescriptions for 2013 and 2014 (totaling approximately $30,000), but submitted 301 claims for reimbursement in 2015 for the same types of prescriptions for

13

total claims of approximately $13,831,682, on which TCMP
received payments of approximately $2,164,257 from Tricare for
prescriptions for which Tricare showed N.C. as the prescribing
physician.

     b.   Haeoyou Pharmacy ("HY") is located in Palmdale,
California.  During calendar year 2013, HY submitted zero claims
to Tricare for reimbursement for filling compounded medication
prescriptions.  For calendar year 2014, HY submitted
approximately 31 claims to Tricare for reimbursement for filling
compounded medication prescriptions, and was paid approximately
$62,278 on those claims.

     c.   For calendar year 2015, HY submitted
approximately 2,798 claims to Tricare for reimbursement for
filling compounded medications prescriptions, and was paid
approximately $46,294,453 on those claims.  Tricare paid HY
approximately $4,366,638 based on compounded medication
prescriptions that reflected N.C. as the prescribing physician.
The latter figure was in part based on HY's 2015 Tricare claims
totaling approximately $39,403 for reimbursement for filling
compounded medication prescriptions for patients A.L. (3
prescriptions), R.P.J., P.S., and F.P (2 prescriptions).  Based
on my review documents provided by N.C., I learned that N.C. had
specifically identified these individuals as patients whose
files she had reviewed for PADUANO, as discussed above, and for
whom she had NOT authorized any medication.

     d.   Based upon information and digital data provided
by the owner of HY, who is cooperating with this investigation,

at least one of those prescriptions identified in "13.c.," above, was sent to HY from individuals connected with a so-called "marketing" business known as Trestles RX or Trestles Pain Management Specialists ("Trestles"), who did business at 25971 Pala, Suite 120, Mission Viejo, California.  Based upon my review of documents obtained in this case, I learned that Trestles had referred dozens (if not hundreds) of compounded medication prescriptions to HY for fulfillment with the expectation of receiving in return 65% of HY's Tricare adjudications.

   e.   I also know from speaking to agents who interviewed L.M., that L.M. was formerly connected with Trestles and that L.M. and others at Trestles hired telemedicine sites to promote compounded medications prescriptions that Trestles and others routed to pharmacies, including HY, in exchange for a

///

///

///

///

///

///

///

///

///

///

///

///

15

large percentage of Tricare adjudications paid to the pharmacy.

**IV.    CONCLUSION**

13.    For all of the reasons described above, I believe there is probable cause to believe that ROBERT PADUANO committed health care fraud, in violation of 18 U.S.C. § 1347.

_____
Monica Pandis, Special Agent
Federal Bureau of Investigation

Subscribed to and sworn before me
this _20_ day of June, 2016.

_____
HONORABLE
UNITED STATES MAGISTRATE JUDGE

KAREN E. SCOTT

16

ATTACHMENT "A" TO COMPLAINT (PADUANO)

[18 U.S.C. §§ 1347, 2(a),(b)]

I.    GENERAL ALLEGATIONS
      A.    Defendant and Related Entities
      At all relevant times,
            1.    Defendant ROBERT PADUANO ("defendant PADUANO") owned and
operated a business entity called Global Marketing Strategies LLC ("GMS"), in or about St.
Augustine, Florida, through which defendant PADUANO operated an Internet-based
telemedicine site.
            2.    TC Medical Pharmacy ("TCMP") was a pharmacy located at 760
Washburn Ave., Suite 1, Corona, California 92882, within the Central District of California.
T.L. was TCMP's pharmacist-in-charge.
            3.    Trestles RX LLC and Trestles Pain Management Specialists LLC
(collectively "Trestles") were located at 25971 Pala, Suite 120, Mission Viejo, California.
            4.    L.M. was a "distributor" at Trestles and, in the Trestles hierarchy, was
over defendant PADUANO who was L.M.'s "sub-distributor."
      B.    TRICARE
            3.    TRICARE was a federal health benefit program, as defined by 18 U.S.C.
§ 24(b), that provided coverage for Department of Defense beneficiaries world-wide, including
active duty service members, National Guard and Reserve members, retirees, their families, and
survivors.
            4.    For the calendar years 2013-2015, inclusive, TCMP submitted
approximately 329 claims for TRICARE reimbursement for filling compounded medication
prescriptions for a total claimed amount of approximately $11,013,150.
      D.    Compounded Medications
            5.    In general, "compounding" is a practice in which a licensed pharmacist, a
licensed physician, or, in the case of an outsourcing facility, a person under the supervision of a
licensed pharmacist, combines, mixes, or alters ingredients of a drug or multiple drugs to create a
drug tailored to the needs of an individual patient. Compounded drugs are not FDA-approved,
that is, the FDA does not verify the safety, potency, effectiveness, or manufacturing quality of
compounded drugs. The California State Board of Pharmacy regulates the practice of
compounding in the State of California.
            6.    Compounded drugs may be prescribed by a physician when an FDA-
approved drug does not meet the health needs of a particular patient. For example, if a patient is
allergic to a specific ingredient in an FDA-approved medication, such as a dye or a preservative,
a compounded drug can be prepared excluding the substance that triggers the allergic reaction.
Compounded drugs may also be prescribed when a patient cannot consume a medication by

traditional means, such as an elderly patient or a child who cannot swallow an FDA-approved pill and needs the drug in a liquid form that is not otherwise available.

II.     THE FRAUDULENT SCHEME

7.      Beginning on or about a date unknown, and continuing to in or about June 2015, in Orange, Riverside, and Los Angeles Counties, within the Central District of California, and elsewhere, defendant PADUANO, together with others known and unknown, knowingly, willfully, and with the intent to defraud, executed and attempted to execute a scheme and artifice: (1) to defraud a federal health care benefit program, namely, Tricare, as to material matters in connection with the delivery of and payment for health care benefits, items, and services; and (b) to obtain money from Tricare by means of material false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

8.      The fraudulent scheme operated, in substance, in the following manner:

a.      Defendant PADUANO, and others known and unknown, would operate an online telemedicine site through which defendant PADUANO, and others known and unknown, would promote compounded medication prescriptions for L.M., and others at Trestles, and others known and unknown, the cost for fulfillment of which would be reimbursed by Tricare.

b.      Defendant PADUANO, and others known and unknown, would retain physicians, including N.C., to review patient files created in connection with the operation of defendant PADUANO's telemedicine site. Defendant PADUANO would represent to such physicians that the files had been prepared by nurse practitioners or other qualified health care providers when, as defendant PADUANO well knew, nurse practitioners or other qualified health care providers had not prepared such files.

c.      Defendant PADUANO, and others known and unknown, without N.C.'s permission, would use N.C.'s identity and medical credentials to authorize compounded medication prescriptions.

d.      Defendant PADUANO, and others known and unknown, would cause prescriptions, both authorized by his telemedicine doctors, and not authorized, to be sent to Trestles, and others known and unknown, for routing to pharmacies of Trestles' choice, and to pharmacies of PADUANO's choice, for fulfillment and billing to, and payment from, Tricare.

e.      The pharmacies would, in turn, pay defendant PADUANO, and others known and unknown, a substantial percentage of Tricare claims adjudication payments for sending those prescriptions.

f.      Defendant would bribe and threaten N.C. from disclosing the misuse of her identity and medical credentials in order to continue and conceal the existence of the fraudulent scheme.

III.    EXECUTION OF THE FRAUDULENT SCHEME

9.      In or about April 2015, Trestles, from Mission Viejo, California, caused to be sent to Haeoyou Pharmacy, in Palmdale, California, a prescription to be filled for Tricare beneficiary F.P.

10.     In or about April 2015, TCMP filled, and obtained Tricare reimbursements on claims for, prescriptions for A.B., K.R., A.N., B.M.P., and C.W.